30 C.C.P.A.(Patents)

### DREYER v. HAFFCKE.

### No. 4773.

Court of Customs and Patent Appeals.

July 6, 1943.

Harry G. Grover, James G. Norton, and Abraham S. Greenberg, all of New York City, for appellant.

J. F. Mothershead, J. Y. Houghton, and T. Hayward Brown, all of Washington, D. C., for appellee.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

HATFIELD, Associate Judge.

This is an appeal in an interference proceeding from a decision of the Board of Appeals of the United States Patent Office affirming the decision of the Examiner of Interferences awarding priority of the invention defined by the two counts in issue to appellee.

The interference is between appellee's patent No. 2,106,172, issued January 25, 1938, on an application filed July 30, 1936, and appellant's application No. 245,483, filed December 13, 1938, for the reissue of his patent No. 2,107,409, issued February 8, 1938, on an application filed October 2, 1934.

Appellee is the junior party, and the burden was upon him to establish priority of invention by a preponderance of the evidence.

The involved invention relates to a method of operating a vacuum tube.

The counts in issue read:

"1. A method of operating a vacuum tube having a cathode, an anode, a control grid, and a plurality of other electrode elements, which comprises so adjusting exterior circuit values affecting said tube that at least a major portion of the current through the cathode, deriving from the electron stream, passes through elements in said tube other than said anode when the input signal voltage is of greater than a predetermined value.

"2. A method of operating a vacuum tube having at least one electrode element in addition to a cathode, an anode and a control grid, which comprises so adjusting exterior circuit values affecting said tube that at least a considerable portion of the current through the cathode, deriving from the electron stream, is diverted from the circuit that includes said anode when the

input signal value exceeds a predetermined value."

It appears from the record that appellant's application has been assigned to the Radio Corporation of America. It further appears that the interference was originally declared between the patent of appellee and an application of one Louis Malter, which application was also owned by the Radio Corporation of America.

On February 8, 1939, appellee moved to dissolve the interference as originally declared, on the ground that the Malter application did not support the counts. On the same day appellant's assignee moved to substitute appellant's reissue application for the application of Malter.

The motion to substitute was opposed by appellee on the ground that neither the disclosure in appellant's reissue application nor the disclosure in his patent supports the counts. Appellee also opposed that motion on the ground that appellant's assignee was estopped to substitute the Dreyer application.

The Primary Examiner sustained the motion to substitute appellant's application for the Malter application, and held that by sustaining such motion the question raised by appellee's motion to dissolve the interference between his patent and the Malter application had become moot and, accordingly, dismissed the motion to dissolve.

Thereafter on October 3, 1939, the interference was redeclared, the application of appellant being substituted for that of Malter.

On February 4, 1941, appellee moved to dissolve the interference on the ground that Dreyer was barred from obtaining a patent for the subject matter of the counts.

That motion was dismissed by the Examiner of Interferences on the ground that it was made long after the motion period had expired, and no good reason had been shown for the delay.

In his preliminary statement, appellant alleged conception of the invention sometime between February 20 and March 17, 1933, and stated that, although he had no actual reduction to practice, he had been diligent in reducing the invention to practice since March 17, 1933.

Appellee alleged in his preliminary statement that he conceived the invention, disclosed it to others, made his first drawing or written description of it, and reduced it to practice sometime between January 1 and August 12, 1931.

Only appellee took testimony, appellant relying on the filing date of his original application (October 2, 1934) for conception of the invention and its constructive reduction to practice.

The Examiner of Interferences held that appellee had established conception and reduction to practice of the invention on August 12, 1931. That date being prior to the filing date of appellant's original application, priority of invention was awarded to appellee.

The Board of Appeals affirmed that holding of the Examiner of Interferences, and appellant appealed to this court.

■ The only issues raised by appellant's appeal involve questions of fact, and, as the tribunals of the Patent Office concurred in findings as to the facts in the case, the rule is here applicable that such findings will be accepted by us unless they are manifestly wrong.

It appears from the record that during the year 1931, and thereafter for a considerable period of time, appellee was employed by the Heany-Biddle Laboratories as a research man; that his work at that time had to do with modifications in gas tube structures and circuits; that on New Year's Day 1931 appellee conceived the idea of freeing electrons in a gaseous discharge in a gas tube, controlling "the flow of those electrons with an input grid built as in a 27 tube," and using such tube "as a radio tube without a filament"; that the next day he made such a tube, and thereafter made approximately ten modifications thereof; that in one of the modifications of the tube when "the grid voltage was increased, the plate current would first rise, and then with further input voltage increase, the plate current would drop off"; that such phenomena "was contrary to any vacuum-tube curves" that he "had ever seen, because," as stated by appellee, all that he had ever seen "had gone up to a point of what we call 'plate saturation' and then leveled off"; that that characteristic was disclosed in a patent, No. 1,947,-774, issued February 20, 1934, on an application filed July 21, 1931, to John Allen Heany and appellee and assigned to Radio Research Laboratories, Inc., which patent was introduced in evidence as appellee's Exhibit No. 1; and that as a result of the antistatic characteristic of the gas tube dis-

closed in Exhibit No. 1, it occurred to appellee that he might get a similar result with a vacuum tube. It further appears from the record that appellee's work in connection with the involved invention was carried on in a laboratory in his home, because he was not permitted to experiment with the standard vacuum tube in the Heany-Biddle Laboratories.

As stated in the decision of the Examiner of Interferences, and restated in substance by the Board of Appeals, "Haffcke [appellee] first set up [and operated] a circuit using a vacuum tube of the 24 type on a breadboard layout. The current to the signal grid of this tube was supplied through a potentiometer which could be varied in steps to provide a slow variation of input to the tube so that the action of the output current could be readily seen on a meter." (By breadboard layout is meant, according to the testimony of appellee, a wooden panel on which are mounted rheostats, resistors, condensers, etc., so that all wire connections and other parts of the circuit are on top of the board where they can be easily seen.)

According to the testimony of appellee, the circuit referred to was made on August 11, 1931, and was successfully operated on August 12 of that year in the presence of appellee's corroborating witness David A. Barnett, an electrical engineer, employed by the Heany-Biddle Laboratories as "general supervisor and collaborator on all development activities."

A drawing of the circuit, on which appeared certain explanations pertaining to the circuit, was made on August 12, 1931, and was witnessed by the witness Barnett on that date. The drawing was introduced in evidence as appellee's Exhibit No. 4.

Although it is argued here by counsel for appellant that appellee's Exhibit No. 4 does not disclose the invention defined by the counts in issue, the tribunals of the Patent Office concurred in holding that it did and there is nothing of record to indicate that they were in error in so holding. Furthermore, no real effort was made by counsel for appellant, either by cross-examination of appellee's witnesses or by the introduction of other evidence on behalf of appellant to establish that Exhibit 4 is not a full disclosure of the involved invention.

It appears from the testimony of appellee and that of his corroborating witness Barnett that, on August 12, 1931, after testing out the circuit in which the signal grid of the tube was supplied through a potentiometer, the breadboard hook-up was connected as a detector with a signal input from a broadcasting station and successfully operated; that is, it suppressed to a great extent the static in the output, reducing it from what is referred to in the record as "a crash" to a hissing sound, which was subordinate to the signal. In other words, it was found that the reception was substantially free from static. It further appears from the testimony of those witnesses that appellee had a radio set on the first floor of his home; that his laboratory where the tests of the breadboard hook-up were conducted was in a bedroom, apparently on the second floor; that the radio set downstairs was tuned in on the same station to which the breadboard hook-up was connected; and that there was considerable static in the reception over the radio downstairs, whereas, as hereinbefore stated, the hook-up being tested in appellee's laboratory was practically free from static.

Appellee introduced other evidence, consisting of drawings witnessed by the witness Barnett. However, owing to the views we hold, it is unnecessary that we discuss those drawings or the testimony in regard thereto.

It is contended here by counsel for appellant that the testimony of appellee that he successfully reduced the invention to practice on August 12, 1931, is not sufficiently corroborated by the witness Barnett.

It is true, as argued by counsel for appellant, that appellee produced no physical exhibits; that Barnett testified approximately ten years after the tests performed in appellee's laboratory on August 12, 1931; that, although appellee stated that Barnett had traced the circuit of the breadboard hook-up, Barnett testified that he had not; and that, in fact, Barnett, when asked whether he noted how the circuits were connected on the breadboard hook-up, said: "As far as checking it up with a drawing; no. What I mean, tracing it out; no. They were connected up there, and I say these wires with clips on them were in more or less of a jumble, and I didn't actually trace them out, no. 'Phil' says, 'This is the hook-up,' and drew it out on paper, so I accepted it as being his."

Immediately following that statement, however, the witness said that he could and did see on the breadboard hook-up that appellee had removed the condenser from

the screen grid circuit; that the resistor in the screen grid circuit was of a high value; and that the plate potential was greatly reduced. He then stated that those three items were "in direct opposition to standard practice, which made the entire situation more—well, have more effect as to the fact of remembering it. I mean more spectacular; because it was, in all three particular things which he had done, it was going directly opposite to standard practice."

The witness Barnett also accurately described the original test in which the signal grid of the tube was supplied through a potentiometer, and stated that appellee secured better results by reducing the plate potential rather than increasing it which was the standard practice. He also testified relative to the second test that, instead of using the potentiometer control, appellee used "the audio end of another breadboard circuit that he had there to amplify the signals, afterwards. In other words, he connected parts of other circuits which he had on to each end of this tube." The witness stated that such a hook-up was operated to receive signals from a radio station; that the signals received were very clear; and that there were no crashes or noises. He further stated that the reception from the breadboard hook-up was compared with the reception from a radio set downstairs that was tuned into the same station, and that " * * * By going down to the foot of the stairs we could hear both of them, and there was very pronounced static noise from the regular set—what that set was, I don't recall now—but it was so very far reduced with this as to be almost negligible—the slight sound, a hissing, or it seemed as if the signal itself, while it was either overpowered or cut off just for very short instants with a little hiss, but not enough to interfere with good reception of the signals—the broadcast."

Although the witness Barnett was not a radio engineer, he was an electrical engineer, and he testified that he knew the fundamentals of radio.

In its decision, the Board of Appeals, commenting on the testimony of the witness Barnett, stated, inter alia: " * * * While it is true Barnett admits that he did not trace out the circuits, still he was able to say that he did note certain peculiarities not present in the normal circuit, such as removing the condenser from across the resister in the screen grid circuit and mak-ing that resister of high value, and also greatly reducing the plate potential. These characteristics apparently stood out in his memory. It is but natural that these differences should make a lasting impression on his mind."

Counsel for appellant criticize the quoted statement from the board's decision, stating in their brief that—

"This seems an astounding conclusion, and entirely unwarranted. Unless Barnett personally traced out the circuits, he simply could not tell in what circuit the high resistor was located; nor could he tell if it was of high or low value by simply looking at the breadboard 'jumble of wires'; nor could he tell if a small by-pass condenser was missing from a specific screen circuit; nor could he tell what the plate potential of any tube was."

If what counsel for appellant state in the quoted excerpt from their brief is true, it is strange that they did not bring out such facts either on cross-examination of appellee and his corroborating witness or by the introduction of evidence on the part of appellant, rather than to depend upon argumentative matter in their brief.

We are unable to accept such statements in a brief, not supported by evidence of record.

The witness Barnett stated positively, as hereinbefore noted, that he could and did see the breadboard hook-up; that the condenser was removed from the screen grid circuit; that the resistor in that circuit was of a high value; that the plate potential was greatly reduced; and that those three items were in direct opposition to standard practice. That being so, and as those three items "are," as stated by the Examiner of Interferences, "the essential elements of the invention in issue and constitute the only features wherein the circuit differs from the usual type of such circuit," the case of Miessner et al. v. Hoschke et al., App.D.C., 131 F.2d 865 (decided by the United States Court of Appeals for the District of Columbia), holding, in accordance with the authorities therein cited, that the testimony of a corroborating witness, who did not know from visual observation the interior structure of a device, was insufficient to constitute corroborative evidence of reduction to practice, has no application to the facts in the instant case.

It will be observed that count 1 differs from count 2 in that it calls for "a cathode, an anode, a control grid, and *a plurality of*

*other electrode elements,"* whereas count 2 calls for "at least *one electrode element* in addition to a cathode, an anode and a control grid." (Italics ours.)

Counsel for appellant argue that appellee failed to establish conception and reduction to practice of count 1 in his tests of August 12, 1931, because he used a 24 type screen grid tube, which, counsel contend, has but one positive grid between the control grid and the anode, rather than a plurality of such grids as called for by count 1.

In reply to that argument, the Board of Appeals said: " * * * It is quite clear from the testimony that the tube which Haffcke used did show as is evidenced by Dreyer's cross-exhibit A, a signal grid [the board obviously meant a screen grid] which was made up of two separate mechanical elements, one, the ordinary coil of wire between the control grid and plate, and the other, a wire mesh surrounding the ouside of the plate. These elements are electrically connected but they are physically and mechanically distinct. The count [count 1] does not say that the electrons must pass through the meshes of the grid-like additional elements, instead it says that the major portion of the current passes through elements other than the anode."

In other words, the board held that the screen grid, which was made up of two separate mechanical elements electrically connected, constituted a plurality of electrode elements as called for by count 1. In so holding, the board concurred in the views expressed by the Examiner of Interferences.

There is nothing in the record to establish that the two separate mechanical elements electrically connected, comprising the screen grid, do not constitute a plurality of electrode elements as called for by count 1.

Again it may be pointed out that much of the brief of counsel for appellant, relating to a discussion of count 1 and ap-

pellee's reduction to practice of the invention defined thereby, involves a highly technical argument for which we find no basis in the evidence of record. Counsel might have fully cross-examined appellee and his corroborating witness with regard to matters relating to a plurality of electrodes as set forth in count 1, or they might have submitted evidence on the part of appellant to establish that appellee's test performed in the manner and with the device hereinbefore set forth did not conform to the method defined in count 1 or that defined in count 2. That they failed to do.

It is also contended by counsel for appellant that as appellee did not file his involved application until July 30, 1936, nearly five years after his claimed reduction to practice the tests made on August 12, 1931, must be considered abandoned experiments.

It clearly appears from the record that at no time after the tests performed on August 12, 1931, did appellee abandon the idea of filing an application for a patent for his invention. It also appears that he was financially unable to personally file and prosecute an application for a patent, and that he could not secure financial assistance to enable him to do so until he became employed by the Naval Research Laboratory in August 1934 and was able sometime later to convince his superiors of the utility of his invention for Navy purposes, after which the involved application was prepared and filed by the Navy Department without charge to appellee in exchange for a license to the United States Government.

For the reasons stated, we are unable to hold that the tribunals of the Patent Office reached the wrong conclusion. Accordingly, the decision of the Board of Appeals is affirmed.

Affirmed.

LENROOT, Associate Judge, took no part in the consideration or decision of this case.